**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:18-cv-03098-RM-NRN

SONDRA BEATTIE and FRANCIS HOUSTON, JR., individually and on behalf of all other similarly situated individuals,

      Plaintiffs

v.

TTEC HEALTHCARE SOLUTIONS, INC. and TTEC HOLDINGS, INC.,

      Defendants.

---

**PLAINTIFFS' MEMORANDUM OPPOSING DEFENDANTS' FOURTH MOTION TO COMPEL ARBITRATION OF CERTAIN OPT-IN PLAINTIFFS**

---

## I.    INTRODUCTION

Defendants TTEC Healthcare Solutions, Inc. and TTEC Holdings, Inc. ("Defendants") aver that 2,487 opt-in plaintiffs entered into binding agreements to arbitrate the claims brought in this matter. (ECF No. 190, Defendants' Fourth Motion to Compel Arbitration of Certain Opt-In Plaintiffs ("Motion") at 2 (citing ECF No. 190-1, Declaration of Gretchen Pfeifer ("Pfeifer Decl.") ¶¶ 5-10).)[1] However, Defendants fail to cite their burden of proof in succeeding on their motion. Using the proper standard, it is clear that Defendants' proffered evidence fails to meet that burden.

At the outset, the Opt-In Plaintiffs do not contest Defendants' position that if the Opt-In Plaintiffs accepted the terms of the arbitration agreements, under the relevant law, it would constitute a binding contract, and the arbitration provision would cover the Opt-In Plaintiffs' claims. The Opt-In Plaintiffs' argument is that there is no binding agreement between the parties

---

[1] The 2,487 opt-in plaintiffs subject to Defendants' motion are identified at Exhibit E to the Pfeifer Decl. (ECF No. 190-6) and are collectively referred to herein as the "Opt-In Plaintiffs".

1

because the Opt-In Plaintiffs never agreed to, nor signed, the arbitration agreements.

## II.   LEGAL ARGUMENT

### A.   STANDARD OF REVIEW

Although the Federal Arbitration Act ("FAA") applies to this matter, its presumption of arbitrability is inapplicable to the question before this Court. While the FAA reflects "a liberal federal policy favoring arbitration," it also reflects the "fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). The FAA reversed a "longstanding judicial hostility to arbitration agreements," favoring a presumption of arbitrability if an agreement requires arbitration. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). However, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Spahr v. Secco*, 330 F.3d 1266, 1270 (10th Cir. 2003). Thus, the presumption of arbitrability disappears when a party disputes the existence of a valid arbitration agreement. *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir. 2002). "[A] court may compel arbitration of a particular dispute … only when satisfied that the 'making' of the agreement to arbitrate is not at issue." *Spahr*, 330 F.3d at 1270. Where, as here, the validity of the underlying agreement to arbitrate is at issue, the court uses a burden-shifting framework similar to summary judgment motions.

> In ascertaining whether questions of material fact remain, we give the nonmoving party – here, Plaintiffs – "the benefit of all reasonable doubts and inferences that may arise." We have previously explained that the framework for analyzing this issue "is similar to summary judgment practice": the party moving to compel arbitration bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement; if it does so, the burden shifts to the nonmoving party to raise a genuine dispute of material fact regarding the existence of an agreement. As noted above, if a genuine dispute of material fact exists, the Federal Arbitration Act ("FAA") calls for a summary trial.

*Bellman v. i3Carbon, LLC*, 563 Fed. Appx. 608, 612 (10th Cir. 2014) (internal citations omitted).

For the purposes of a motion to arbitrate (or a summary judgment motion), a fact is

"material" if it is "essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998). There is a "genuine issue" as to a fact where "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**B.    THE ARBITRATION AGREEMENTS ARE UNENFORCEABLE**

**1.    The Revana Arbitration Agreement Is Illusory Because It Binds Only The Employee, And Not Defendants, To Its Terms**

There are three arbitration agreements at issue: The Revana agreement; the TTEC agreement; and the Taleo agreement. (Pfeifer Decl., Ex's A-C.) The Revana agreement states at the bottom of each page: "Revana reserves the right, in its sole discretion, to modify, amend, adjust, or revise its policies and guidelines at any time without advance notice." (*Id.*, Ex A.) In other words, Defendants can alter the Revana agreement at any time, for any reason, and without prior notice or consent. (*Id.*) Hence, the Revana agreement is illusory because it binds only the employee, and not Defendants, to its terms. *See Dumais*, 299 F.3d at 1219 (holding that "an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory" and unenforceable). Thus, the motion must be denied for the five opt-in plaintiffs who allegedly signed the Revana agreement: Jennifer Anderson, James Keller, June Scott, Alicia Whatley and Chrisha Williams. (*See* Pfeifer Decl., Ex E.)

**2.    The Arbitration Agreements Are Indefinite As To An Essential Element Of The Contract, Namely, The Identity Of The Employee To Be Bound**

Notably, Defendants' arbitration agreements are unsigned, undated, and do not identify the employees bound by the agreements. (*Id.*, Ex's A-C.) The agreements include a blank line in the opening sentence where one would write/type the employee's name and three blank lines at the end of the agreements where one would print and sign their name and date the agreement. (*Id.*) Under Colorado law, the essential elements of a contract are: **competent parties**, subject matter,

a legal consideration, mutuality of agreement, and mutuality of obligation. *Denver Truck Exch. v. Perryman*, 307 P.2d 805, 810 (Colo. 1957). Here, the absence of the Opt-In Plaintiffs' names from the arbitration agreements renders the agreements indefinite as to an essential element of the contract, namely, the identity of the employee to be bound.[2]

While some courts have held that parol evidence is permissible to identify the parties to a contract, *see, e.g., Stadco Acq. LLC v. Aerospace Holdings Inc.*, No. 16-cv-942, 2016 WL 9343892, at *4 (C.D. Cal. July 26, 2016), the arbitration agreements at issue explicitly define the Employee as "the undersigned employee" and have a signature block for the Employee. (Pfeifer Decl., Ex's A-C.) Hence, the parties unambiguously intended for the Employee's printed or electronic name or signature to be the exclusive means to identify the Employee allegedly bound by the agreement. This intent is further reinforced by the fact that the agreements contain an integration clause plainly manifesting the parties' intent that the writing constitutes the entire agreement. (*Id.*, Ex's A-C ¶¶ 10.) Where, as here, the terms of an agreement are embodied in a detailed written document with an integration clause, it would be improper for this Court to rewrite that agreement by looking to evidence outside the four corners of the contract to identity the Employee when the express terms in the written document unambiguously define Employee as the person whose printed or electronic name or signature is affixed to the agreement. *See Prof. Bull Riders, LLC v. Perfect Blend Intl., LLC*, 14-CV-03510, 2016 WL 54115, at *4 (D. Colo. Jan. 5, 2016) ("A court may look beyond the four corners of an agreement to determine the intent of the parties only when there is an ambiguity in the terms of the agreement.").

---

[2] *See Mahmoudiani v. Bartlett Care Ctr., LLC*, G055851, 2019 WL 1450424, at *2 (Cal. App. 4th Dist. Apr. 2, 2019) (concluding the arbitration agreement fails for lack of identifying the parties and refusing to insert the parties into the contract and do what the parties themselves should have done) (unpublished opinion applying California law).

Defendants will undoubtedly argue that Employee means the employee who electronically acknowledged the agreement during the new hire onboarding process, and thus, the agreements do not fail because these employees are identified in business records, such as "Certificates of Completion" and "Training Transcripts." But this argument is an affront to basic contract law.

*First*, "an arbitration agreement must be given effect according to the plain and ordinary meaning of its terms." *Allen v. Pacheco*, 71 P.3d 375, 378 (Colo. 2003). The agreements expressly define Employee as "the undersigned employee." (Pfeifer Decl., Ex's A-C.) Merriam-Webster defines "undersigned" as "one whose name is signed at the end of a document." (*https://www.merriam-webster.com/dictionary/undersigned*.) Hence, the express language of the agreements plainly and unambiguously manifest the parties' intent that Employee means the employee whose printed or electronic name or signature is affixed to the agreement. *See Allen*, 71 P.3d at 378 ("We ascertain the parties' intent by looking to the plain language of the agreement.").

*Second*, "[a]ny ambiguity in a contract should be construed against the drafter." *Benham v. Pryke*, 744 P.2d 67, 72 (Colo. 1987). Hence, even if the meaning of Employee is ambiguous (which it is not), the ambiguity would be construed against Defendants.

*Third*, the Court cannot resort to extrinsic evidence, including Defendants' business records, to identify the Employee bound by the agreement, because doing so would alter or modify an expressly defined and unambiguous contract term. At the risk of repetition, the agreements define Employee as "the undersigned employee." (Pfeifer Decl., Ex's A-C.) If the parties intended to identify the Employee using extrinsic evidence, then the agreements would not contain an integration clause, nor would they define Employee as "the undersigned employee" and have a signature block for the Employee. *See Prof. Bull Riders, LLC*, 2016 WL 54115, at *4 (The parties' intent "is determined from the language of the contract itself, and written contracts that are

complete and free from ambiguity will be enforced pursuant to their plain language.").

Where, as here, a written arbitration agreement contains an integration clause and plainly identifies the Employee bound by the agreement as the employee whose printed or electronic name or signature is affixed to the agreement, the absence of a printed or electronic name or signature renders the agreement indefinite as to the identity of the employee to be bound, and thus, no binding contract is created. *See Nelson v. Elway*, 908 P.2d 102, 107 (Colo. 1995) ("We will not step into a … transaction after the fact and attempt to ascertain the intent of the parties when that intent is clearly manifested by an express term in a written document.").[3]

## C.     DEFENDANTS INDISPUTABLY FAILED TO SATISFY THEIR BURDEN TO DEMONSTRATE THE EXISTENCE OF AN ENFORCEABLE AGREEMENT

Even if the Court rejects Plaintiffs' argument that the agreements are indefinite as to an essential element of the contract, denial of the motion is nonetheless warranted because Defendants failed to satisfy their initial burden of demonstrating the existence of an enforceable agreement.

### 1.     Defendants Failed To Submit Any Documentary Evidence Demonstrating The Existence Of An Enforceable Arbitration Agreement

Notably, Defendants fail to even *acknowledge* that they carry the initial burden. Perhaps that explains why Defendants have curiously chosen to proffer *no documentary evidence whatsoever* that the Opt-In Plaintiffs assented to an arbitration agreement. The only documents submitted by Defendants are unsigned and undated arbitration agreements. (Pfeifer Decl., Ex's A-C.) Instead, Defendants direct the Court's attention – in a footnote, no less – to "Certificates of Completion" and "Training Transcripts" allegedly showing that the Opt-In Plaintiffs agreed to

---

[3] To the extent Defendants argue that the Opt-In Plaintiffs manifested assent to the agreements by electronically clicking an "Accept" button, and that physically or electronically affixing their names or signatures to the agreements was never required to manifest assent, this is irrelevant. Even assuming, *arguendo*, that the Opt-In Plaintiffs did, in fact, assent to the agreements, the agreements still fail because they are indefinite as to the identity of the employee to be bound.

arbitrate their claims during the new hire onboarding process. (Motion at 2 n.1.) Incredibly, Defendants have not submitted this evidence but have instead *offered* to submit the evidence upon the Court's request. (*Id.*) This is unfathomable. Defendants seek to usher 2,487 Opt-In Plaintiffs to arbitration based on nothing more than Defendants' self-serving pledge that the underlying evidence allegedly showing that the Opt-In Plaintiffs agreed to arbitrate can be submitted to the Court, if necessary, at some later undetermined time, meaning that the Opt-In Plaintiffs must defend themselves from Defendants' attempt to banish them to arbitration without even having the opportunity to examine and confront the evidence against them. These are the same Defendants, mind you, who from the beginning of this case have represented to the Court that *all* of the opt-in plaintiffs agreed to arbitrate their claims during the new hire onboarding process but then proceeded to *admit* that they couldn't even find evidence that they even *employed* dozens of these opt-in plaintiffs, let alone evidence that they agreed to an arbitration agreement. Suffice it to say, these Defendants have not earned the benefit of the doubt and have pointed to no authority for the notion that they can satisfy their initial burden of establishing a prima facie case of an agreement by withholding the underlying evidence from the Opt-In Plaintiffs and promising to submit the evidence upon request. This is ridiculous and, so far as Plaintiffs are aware, unprecedented.

By failing to submit the so-called "Certificates of Completion" and "Training Transcripts", Defendants have not only failed to meet their initial burden, but have deprived the Opt-In Plaintiffs of a fair opportunity to review and challenge the evidence against them. This failure *alone* is dispositive of this motion. Defendants will surely retort that the "Certificates of Completion" and "Training Transcripts" are substantively identical to the evidence submitted with their prior motions to compel arbitration, but this misses the point. These Opt-In Plaintiffs were not subject to the prior motions to compel, and thus, the evidence submitted with Defendants' prior motions

is irrelevant to the Opt-In Plaintiffs and the instant motion at issue. Consequently, Defendants'

motion must be denied in its entirety for failure to make out a prima facie case of an agreement.

> **2.** **Defendants' Declaration Testimony Is Insufficient To Establish The Existence Of An Enforceable Arbitration Agreement**

The bare assertions in Defendants' declaration are insufficient to save Defendants' motion.

To determine whether the Opt-In Plaintiffs agreed to arbitrate their claims, Defendants

> reviewed the names of the individuals who filed opt-in consent forms with the Court and compared it to the class list sent to Plaintiffs' counsel on October 4, 2019. For the individuals that appeared on both lists, we identified their employee ID number ***to the best of our ability*** (many of the individuals had very common names and/or illegible handwriting). Using these ID numbers, we then exported data from our Meridian and HRMS programs to determine which individuals executed arbitration agreements.

(Pfeifer Decl. ¶ 12 (emphasis added).)

Defendants' declaration suffers from numerous indicia of unreliability. The first problem

is Defendants' use of ID numbers to determine which plaintiffs agreed to arbitration. The use of

ID numbers, in and of itself, is not an issue, except for the fact that Defendants admitted that they

had difficulty identifying "many" of these plaintiffs' ID numbers and thus did so "*to the best of*

*our ability*." (*Id*. (emphasis added).) Thus, Defendants cannot even be sure that they used the

correct ID numbers to determine which individuals executed arbitration agreements.

Notably, Defendants fail to explain the protocol that was used for the "many" individuals

who had very common names and/or illegible handwriting, which raises numerous questions

relating to reliability. For example, how many individuals had very common names and/or illegible

handwriting? What are their names? What did Defendants do to ensure that they used the correct

ID number for individuals with very common names and not the ID number of another employee

with the same or similar name? What did Defendants do to ascertain the identity of individuals

with illegible handwriting? Were Defendants able to ascertain their identity? If so, how? If not,

how did Defendants know which ID number to use for these individuals? Are there any reliable indicators that can confirm that the correct ID number was used for each plaintiff? For example, do the ID numbers contain any indicators unique to each individual employee, such as the last four digits of the employee's Social Security Number? How do Defendants assign ID numbers? When are the ID numbers assigned? Who has access to the ID numbers? Were the ID numbers used by the Opt-In Plaintiffs when they allegedly accessed and signed the arbitration agreement? What security protocols do Defendants employ, if any, to ensure that an electronic acknowledgement of documents under a particular ID number is attributable to a particular employee?

All of these unanswered questions are exacerbated by Defendants' inexplicable failure to include the ID numbers on the chart listing the individual plaintiffs who allegedly assented to an arbitration agreement. (*See* Pfeifer Decl., Ex E.) By failing to include the ID numbers with their motion, Defendants have deprived the Opt-In Plaintiffs of the opportunity to determine whether Defendants used the correct ID numbers when conducting their search.

Even assuming that Defendants used the correct ID number for each plaintiff (and Plaintiffs do not accept that assumption), Defendants fail to offer any evidence that the ID numbers are a sufficient basis in which to determine that any particular employee signed the arbitration agreement. The only explanation offered by Defendants is that "[u]sing these ID numbers, we then exported data from our Meridian and HRMS programs to determine which individuals executed arbitration agreements." (Pfeifer Decl. ¶ 12.) But how? What are the Meridian and HRMS programs and how were they used to determine which employees signed an arbitration agreement? What type of information can be ascertained from these programs and how is the information ascertained? What is the relationship between these programs, the employees' ID numbers, and the employees' alleged execution of the arbitration agreements? As noted above, these unanswered

questions are only exacerbated by Defendants' failure to disclose the ID numbers for the individuals they seek to compel to arbitration.

Ms. Pfeifer's declaration suffers from other critical deficiencies. Even though she attests that Defendants have a routine policy of requiring employees to assent to an arbitration agreement during the new hire onboarding process (*id.* ¶¶ 5-6), she *does not allege* that she has personal knowledge that the Opt-In Plaintiffs electronically signed the arbitration agreements based on her personal review of business records made by someone with knowledge at or near the time that the Opt-In Plaintiffs allegedly signed the agreements. This omission is especially egregious given the fact that Ms. Pfeifer fails to elaborate or provide any sort of detail regarding the new hire onboarding process, the protocols or procedures relating to the electronic completion of company documents, or the security protocols, if any, designed to ensure that an employee's electronic acknowledgement of company documents was, indeed, attributable to that particular employee.[4]

While employers have successfully compelled arbitration based on declaration testimony that the employer has a routine practice of requiring employees to sign arbitration agreements as a condition of employment, Defendants cite no case law – nor are Plaintiffs aware of any – where routine-practice evidence *alone* was sufficient to establish the making of an agreement, especially where, as here, Defendants have moved to compel less than two-thirds of the opt-in plaintiffs to

---

[4] Ms. Pfeifer asserts that "[t]hrough Taleo, employees are [ ] requested to list a unique identifier as further means to ensure the individual signing the agreement is truly the individual in question" and that "[a] time stamp and IP address are also recorded as part of the eSignature process." (*Id.* ¶ 10.) These assertions do not authenticate the Opt-In Plaintiffs' alleged electronic assent. For starters, only a small minority of the Opt-In Plaintiffs allegedly assented to arbitration through Taleo. (*See id.*, Ex E.) Furthermore, Ms. Pfeifer fails to explain how, exactly, the "unique identifier" serves to ensure the individual assenting to the arbitration agreement through Taleo was truly the individual in question. Finally, Defendants failed to submit evidence of the "time stamp and IP address" that are allegedly recorded as part of the Taleo eSignature process, nor do they explain how the "time stamp and IP address" serve as reliable indicators of authenticity. Defendants' conclusory assertions are insufficient to authenticate electronic assent.

arbitration, casting serious doubt over Defendants' claim that *all* employees are required to electronically assent to an arbitration agreement during the new hire onboarding process.

Critically, when Defendants compelled Named Plaintiffs Sondra Beattie ("Plaintiff Beattie") and Francis Houston, Jr. ("Plaintiff Houston") to arbitration, they relied upon routine-practice evidence *and* business records in the form of "training transcripts" allegedly showing that Plaintiffs Beattie and Houston signed the arbitration agreement. (*See* ECF No. 18-1, Declaration of Anna Haugen, Ex's B-C.) In fact, Ms. Haugen avowed personal knowledge that Plaintiffs Beattie and Houston accepted the arbitration agreement based upon her review of their training transcripts "showing [they] executed the Arbitration Agreement[.]" (*Id.* ¶¶ 3-5.)

Here, by contrast, Ms. Pfeifer does not avow personal knowledge that the Opt-In Plaintiffs accepted the arbitration agreements based upon her review of "training transcripts" but instead used "information available in TTEC's Human Resources records" to construct a chart purporting to show which plaintiffs signed the agreement. (Pfeifer Decl. ¶ 12.) She does not even *allege*, let alone establish, that these unidentified records are *business records* created by a person with knowledge at or near the time that the Opt-In Plaintiffs allegedly signed the agreements. Consequently, these unidentified records constitute inadmissible hearsay because Defendants have adduced no foundational evidence suggesting that the records, which were not even produced, satisfy *any* of the requirements for the business records exception to the rule against hearsay.[5] This

---

[5] The business records exception applies only if the custodian of the records, or some other "qualified witness" offers a declaration attesting that "the record was made at or near the time by – or from information transmitted by – someone with knowledge; ... the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; [and] making the record was a regular practice of that activity." Fed. R. Evid. 803(6)(A)-(C). The Pfeifer Declaration does not satisfy these requirements, which are not addressed at all. Furthermore, the business records exception does not apply if the opponent "show[s] that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness," as is the case here. Fed. R. Evid. 803(6)(E).

District previously held that "[i]t is not proper to consider inadmissible evidence when resolving a motion for summary judgment." *Faircloth v. Schwartz*, No. 12-cv-02764, 2016 WL 865487, at *2 (D. Colo. Mar. 7, 2016). Hence, denial of Defendants' motion is warranted.

Relatedly, the chart attached as Exhibit E to the Pfeifer Declaration is also inadmissible. Federal Rules of Evidence 1006 provides that "the content of voluminous writings, recordings, or photographs that cannot conveniently be examined in court" may be presented in the form of a chart, summary or calculation. However, "[i]n order for a summary to be admissible, it must be drawn from records that are otherwise admissible." *Trans-Rim Enters. (USA), Ltd. v. Adolph Coors Co.*, No. 94-1236, 1995 WL 231381, at *3 (10th Cir. Apr. 7, 1995).

As the proponent of the chart, Defendants bore the burden to "lay a proper foundation for the admission of the original materials" upon which the chart is based. *United States v. Anderson*, No. 96-7044, 1996 WL 740845, at *2 (10th Cir. Dec. 27, 1996). Nevertheless, Defendants neither stated precisely what these underlying records are nor attached them to the Pfeifer Declaration, leaving the Opt-In Plaintiffs and the Court without a clear picture of the nature or content of the underlying material. Hence, the chart is inadmissible due to Defendants failure to lay a proper foundation for the admission of the underlying records supporting the chart.

Defendants cannot rely on "training transcripts" to compel Plaintiffs Beattie, Houston, and 68 other opt-in plaintiffs to arbitration and then ask the Court to *also* compel 2,487 additional plaintiffs to arbitration even though Defendants do not submit *any* records, including "training transcripts," indicating that these plaintiffs signed an arbitration agreement. To be sure, such a request is entirely inconsistent with this Court's Order (ECF No. 66) granting Defendants' Motion to Compel Individual Arbitration, where the Court specifically pointed to Defendants' *business records* as supporting their contention that Plaintiffs Beattie and Houston electronically assented

to the arbitration agreement:

> Defendants' contention that Plaintiffs Beattie and Houston manifested their assent to the arbitration agreement by clicking the "Accept" button **is supported by employee data they routinely collect and maintain in the form of spreadsheets**. Defendants' position is further supported by the declaration of its director of human capital, **who explained that the spreadsheets reflect that Plaintiffs Beattie and Houston executed the arbitration agreement**.

(*Id.* at 4 (emphasis added) (omitting internal citation).)

Here, Defendants did not submit *any* records – let alone routinely-collected business records – showing that the Opt-In Plaintiffs executed an arbitration agreement. Compelling arbitration under these circumstances is completely unwarranted.

### 3. <u>Case Law Plainly Shows That Routine-Practice Evidence, Without More, Is Insufficient To Compel Arbitration</u>

The relevant case law shows that to compel arbitration based upon declaration testimony of a routine policy requiring employees to sign arbitration agreements, the employer must submit *some* further indicia of reliability, such as business records allegedly showing that the party being compelled to arbitration did, indeed, assent to an arbitration agreement and declaration testimony that the employer's business records made at or near the time by someone with knowledge show that the employee being compelled to arbitration actually signed an arbitration agreement.

For example, in *Mitchell v. Craftworks Restaurants & Breweries, Inc.*, No. 18-cv-879, 2018 WL 5297815, at *6 (D.D.C. Oct. 25, 2018), the court held that the plaintiff electronically signed the Arbitration Agreement where the defendant submitted a sworn declaration from its Director of Human Resources stating that new employees are provided an arbitration agreement and that the company's business records indicate that the plaintiff electronically signed the Arbitration Agreement on October 20, 2016, which was around the time her employment began. And while the court acknowledged that the declaration failed to describe the defendant's digital signing procedures, the declaration stated that the declarant "ha[s] personal knowledge of the

matters contained in this declaration" and "ha[s] knowledge based on [her] personal review of business records made at or near the time by someone with knowledge." *Id*. (emphasis added).

As noted above, Ms. Pfeiffer does attest that there are any *business records* indicating that the Opt-In Plaintiffs electronically signed an arbitration agreement, nor does she avow personal knowledge that the Opt-In Plaintiffs accepted the arbitration agreement based upon her review of routinely-collected *business records*. Instead she relied exclusively upon unidentified information available in the human resources department without explaining what this information is or whether or not the information – which was not attached to her declaration – constitutes business records made at or near the time that the Opt-In Plaintiffs allegedly agreed to arbitrate.

To be sure, Defendants' failure to submit business records is not, in and of itself, fatal to their motion. However, absent business records or an accompanying declaration attesting that the company's business records made at or near the time by someone with knowledge show that the employee signed an arbitration agreement, the employer must submit *other* indicia of reliability, such as evidence that the employee actually saw and electronically signed the arbitration agreement. *See Gregorius v. Npc Intl., Inc.*, No. 16-cv-593, 2016 WL 6996116, at \*4 (M.D. Fla. Nov. 30, 2016) (compelling arbitration because "the competent evidence offered by [defendant] is sufficient to establish the existence of an arbitration agreement …, including evidence that plaintiff at least electronically opened the Agreement and electronically signed it.") (emphasis added).

Here, there is no competent evidence whatsoever that *any* of the Opt-In Plaintiffs ever even *saw* an arbitration agreement, let alone electronically assented to one. Ms. Pfeifer was not present when the Opt-In Plaintiffs signed the agreements, and, as noted repeatedly above, has no personal knowledge based on her review of business records made at or near the time the Opt-In Plaintiffs allegedly agreed to arbitrate. Testimony from a human resources employee that she relied upon

unidentified information available in human resources records to build a chart showing that the Opt-In Plaintiffs signed an arbitration agreement is woefully insufficient to show electronic assent.

What Defendants fail to appreciate is that while it's true that some courts have found the declaration of human resource employees sufficient to authenticate the electronic acknowledgement of an arbitration agreement, the *content* of such declarations, rather than their mere existence, is determinative. To sufficiently authenticate an arbitration agreement, courts have consistently required a declaration from a person with knowledge thoroughly explaining the protocol associated with the execution of electronic employment documents or security procedures designed to ensure that any electronic assent was, in fact, attributable to the employee.[6]

For example, when authenticating its arbitration agreement, the defendant in *Tagliabue v. J.C. Penney Corp., Inc.*, No. 15-cv-01443, 2015 WL 8780577 (E.D. Cal. Dec. 15, 2015), submitted the declarations of two Senior Human Resources Managers, one attesting that the plaintiff had signed the agreement and the other "explaining the new hire onboarding and current employee processes for completing company policies." *Id.* at *3. Here, by contrast, Defendants' Executive Director of Human Capital summarily asserts – without elaborating on the new hire onboarding and employee processes for electronically completing company policies and documents – that all employees must assent to an arbitration agreement during the new hire onboarding process.

Likewise, in *Hose v. Washington Inventory Services, Inc.*, No. 14-cv-2869, 2016 WL 6427810 (S.D. Cal. Aug. 30, 2016), the defendant argued that since November 11, 2013, its Dispute Resolution Agreement ("DRA") had been presented to employees via defendant's internal network site during the onboarding process, and that all employees who had completed their

---

[6] Under Colorado law, an electronic signature may be authenticated by "showing [ ] the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable." Colo. Rev. Stat. § 24-71.3-109(1).

onboarding process prior to November 11, 2013 were also required to review and accept or opt out of the DRA using defendant's network site on or after that date. *Id*. at *2. The defendant also attached a true and correct copy of the DRA presented to each employee. *Id*.

The court found defendant's witnesses and declarations to be credible and persuasive evidence that the electronic signatures on the DRAs were an act attributable to the opt-in plaintiffs because the declarants testified *in detail* regarding the security of the intranet system, that the opt-in plaintiffs accessed the DRA by logging in to defendant's intranet with a unique username and password, that the employees had the option to bypass signing the DRA once, but after that the employees were unable to access their schedule and payroll unless they signed the DRA, that an employee could only sign the DRA by inputting his or her unique password, that the DRAs were stored on a secure database, that the signed DRAs were stored in a PDF format that could not be modified, that defendant controlled access to the database in which the DRAs were stored, that only certain people had access to that database, and that those people had to log in with their unique username and passwords to access the database. *Id*. at *6.

Based on this evidence, the court found that the electronic signatures were placed on the DRA by the opt-in plaintiffs using unique logins and passwords, that the employees were required to sign the DRA in order to access their schedules and payroll, that the date and time printed next to the electronic signatures indicate the date and time the DRA was signed, that the DRAs were stored on a secure database in a format that could not be modified, and that none of the opt-in plaintiffs denied electronically signing the DRA. *Id*. Thus, the court found that there was evidence in the record that the opt-in plaintiffs signed the DRAs. *Id*.

Here, there is *no* evidence in the record that the Opt-In Plaintiffs ever even *saw* an arbitration agreement, let alone signed or assented to be bound by one; nor do Defendants contend

that the Opt-In Plaintiffs' employment would not have begun unless they completed the onboarding process or signed the arbitration agreement.

*Gonzales v. Sitel Operating Corp.*, No. 19-cv-00876, 2020 WL 96900 (D. Nev. Jan. 7, 2020), is yet another example of how to properly authenticate electronic assent. In *Gonzales*, defendant created an online "Efficient Hire Profile" for plaintiff after it extended a conditional offer of employment and sent a registration link to her personal email where she could access her Profile by creating a unique password and PIN. *Id.*, at *2. To prove that plaintiff operated the Profile and followed its online procedures,

> Defendant produce[d] a "Document Electronic Signature Certificate." This Signature Certificate reveals Plaintiff's Profile entering confidential information on February 7, 2017, such as a social security number, residence, and banking information. That same date is also associated with Plaintiff's Profile accessing employment documents about Defendant's policies and practices, employee rights, and, most importantly, the "Associate Agreement" containing the arbitration provision at issue here. According to a declaration provided by Kimberly Bacci (a "Global Director HR System" with Defendant), and as detailed in the Signature Certificate, Plaintiff had to click "yes" acknowledging her electronic review of Defendant's employment documents and her agreement with them. The Profile would eventually have prompted Plaintiff to electronically sign all employment forms and documents by providing the designated PIN she created. Only by entering this PIN would her name be affixed on employment documents with a related timestamp. And in alignment with this process, Defendant points to Plaintiff's electronic name printed on an "Associate Agreement," which contains the relevant arbitration provision, alongside a time stamp of February 7, 2017.

*Id.*, at *3 (omitting internal citations).

As another example, in *Taft v. Henley Enterprises, Inc.*, No. 15-cv-1658, 2016 WL 9448485 (C.D. Cal. March 2, 2016), the declaration of defendant's Human Resources Manager

> explain[ed] the new hire onboarding process, which consists of discrete steps that must be completed in order. An audit trail documents the steps that [the plaintiff] took in her onboarding process in reverse chronological order, and it demonstrates that she electronically reviewed and signed the arbitration agreement on September 4, 2014. A new hire can proceed to the next step only after completing all the previous steps of the process, and it is notable that [the plaintiff] appears to have executed other onboarding documents before *and after* she signed the arbitration agreement. Finally, [the d]efendant provides evidence that each new hire creates a

unique username and password that must be entered to access and execute the onboarding materials.

*Id*. at *3 (omitting internal citations) (emphasis in original).

By contrast, in *Ruiz v. Moss Brothers Auto Group*, 232 Cal. App. 4th 836 (2014), a California court of appeal found that the defendant had not authenticated sufficiently an arbitration agreement after submitting two declarations that "summarily asserted" the plaintiff electronically signed the agreement. *Id*. at 843-44. The defendant asserted that an arbitration agreement is presented to "all persons who seek or seek to maintain employment" with the defendant, and "[e]ach employee is required to log into the [defendant's] HR system—each with his or her unique login ID and password—to review and electronically execute" the agreement. *Id.* at 839-41.

Considering the declarations in *Ruiz*, as well as prior cases, the court found the declarations "never explained how [the plaintiff's] printed electronic signature, or the date and time printed next to the signature, came to be placed on the [ ] agreement" or how the defendant "ascertained that the electronic signature … was the act of" the plaintiff. *Id*. at 839. The court noted that authentication "was not a difficult evidentiary burden to meet, but it was not met here." *Id.* at 844.

The same is true in the matter before this Court. Here, Defendants summarily assert that the Opt-In Plaintiffs electronically acknowledged the arbitration agreement during the new hire onboarding process. But Defendants do not explain how they inferred that the Opt-In Plaintiffs completed the onboarding process, how they ascertained that the Opt-In Plaintiffs electronically saw or assented to an arbitration agreement, or how they determined that the arbitration agreement was electronically signed by the Opt-In Plaintiffs during the onboarding process on or near the date they were hired. No steps are detailed; no audit trail discussed. It is, in fact, entirely unclear at what point the Opt-In Plaintiffs allegedly completed the onboarding process and assented to the arbitration agreement, and whether signing the arbitration agreement was just one of several steps

in their onboarding or the only onboarding step they were asked to complete.

Defendants' assertion is deficient; it states a conclusion without providing any steps to illuminate how they arrived at that conclusion. Ms. Pfeifer's assertion that employees are provided an electronic copy of an arbitration agreement during the new hire onboarding process and that she determined that the Opt-In Plaintiffs signed the agreement "using information available in TTEC's Human Resources records" is the only substance offered to authenticate the Opt-In Plaintiffs' alleged electronic assent. Because of the critical gap in evidence supporting Defendants' theory that the Opt-In Plaintiffs electronically acknowledged the arbitration agreement, the Court should find that the Opt-In Plaintiffs' alleged electronic assent is not sufficiently authenticated.

## D. THE OPT-IN PLAINTIFFS' SWORN TESTIMONY RAISES A GENUINE FACTUAL DISPUTE REGARDING THE EXISTENCE OF AN AGREEMENT

Due to Defendants' failure to satisfy their initial burden of showing the existence of an enforceable agreement, the burden does not shift to the Opt-In Plaintiffs under the two-step analysis articulated in *Bellman, supra,* and the motion should be denied for all 2,487 Opt-In Plaintiffs. If, however, this Court finds that Defendants satisfied their initial burden, denial of the motion is nonetheless warranted because 342 Opt-In Plaintiffs unequivocally assert that they never saw, acknowledged, nor signed an arbitration agreement while employed by Defendants. (*See* Exhibit A, Declaration of Rod M. Johnston ("Johnston Decl."), Ex 2 ¶¶ 4-10).[7] Similar testimony was previously submitted by six opt-in plaintiffs and was sufficient to raise a genuine factual dispute on the issue of arbitrability as to those plaintiffs. (*See* ECF No. 181, Order at 3.)

Courts have consistently held that where, as here, a plaintiff swears that (s)he never saw or signed an arbitration agreement, such testimony raises a genuine factual dispute as to the existence

---

[7] *See* Johnston Decl., Ex 1, for a list of Opt-In Plaintiffs who submitted declarations.

of an agreement.[8] This point was recently reinforced in *Camara v. Mastro's Restaurants LLC*, No. 18-cv-7167, 2020 WL 1263998 (D.C. Cir. Mar. 17, 2020), where the Court refused to compel arbitration because the employer did not maintain a signed arbitration agreement and the plaintiff swore he never signed the agreement. Here, just like in *Camara*, Defendants allege a routine practice of requiring employees to sign arbitration agreements but cannot locate or produce any signed agreements. Moreover, 342 Opt-In Plaintiffs swear that they never saw or signed an arbitration agreement. (Johnston Decl., Ex 2 ¶¶ 4-10.) Hence, denial of the motion is warranted.

## III.   CONCLUSION

For the reasons stated herein, this Court should find that Defendants failed to satisfy their initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable arbitration agreement and, therefore, Defendants' motion should be denied in its entirety. Alternatively, if the Court finds that Defendants satisfied their initial burden, this Court should find that the 342 Opt-In Plaintiffs' sworn declaration testimony is sufficient to raise a genuine dispute of material fact regarding the existence of an enforceable arbitration agreement between Defendants and these 342 Opt-In Plaintiffs and, therefore, order a jury trial on the issue.

Dated: May 15, 2020                                     Respectfully submitted,

                                                        /s/ *Rod M. Johnston*
                                                        Matthew L. Turner
                                                        Kevin J. Stoops
                                                        Rod M. Johnston
                                                        SOMMERS SCHWARTZ, P.C.
                                                        One Towne Square, 17th Floor
                                                        Southfield, MI  48076
                                                        (248) 355-0300
                                                        mturner@sommerspc.com
                                                        kstoops@sommerspc.com
                                                        rjohnston@sommerspc.com

---

[8] *See, e.g., Rosales v. Coca-Cola S.W. Beverages LLC*, No. 18-cv-361, 2019 WL 1493359, *6 (W.D. Tex. Apr. 3, 2019); *Cannon v. SFM, LLC*, No. 18-cv-2364, 2019 WL 568581, at *3 (D. Kan. Feb. 12, 2019); *Chester v. DirecTV, L.L.C.*, 607 Fed. Appx. 362, 363-64 (5th Cir. 2015).

## **CERTIFICATE OF SERVICE**

I certify that on May 15, 2020, I electronically filed the forgoing paper with the Clerk of

the Court using the ECF system, which will send notification of such filing to all counsel of record.

/s/ *Rod M. Johnston*